### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### AT OWENSBORO

**ROBERT PAUL SOWDERS, SR.**                                **PLAINTIFF**

**v.**                                  **CIVIL ACTION NO. 4:04CV-P101-M**

**DAVIESS COUNTY DETENTION CENTER** *et al.*           **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Plaintiff Robert Paul Sowders, Sr., filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 (DN 1). This matter is currently before the Court on Defendants' motion for summary judgment (DN 13). Plaintiff did not file a memorandum in response, but he did submit copies of chiropractic records (DN 22). Having reviewed the filings and considered the relevant law, the Court finds that there are no genuine issues of material fact as to Plaintiff's Eighth Amendment claims that he was denied lab work for his hepatitis-C condition, denied replacement eye glasses, and denied medical attention for his complaints of back and neck pain and blood pressure problems. Defendants are thus entitled to summary judgment as a matter of law on those issues. As to the Eighth Amendment claim that he was denied dental treatment, the Court concludes that there are genuine issues of material fact warranting denial of summary judgment on that issue.

### I. PLAINTIFF'S CLAIMS

At the time Plaintiff filed the complaint, he was incarcerated in the Daviess County Detention Center.[1] He brought this civil rights action against the Daviess County Detention Center ("DCDC"); its Jailer, David Osborne; and two of its nurses, Tammy Basham and Sara

---

[1]Based on a recently submitted Notice of Change of Address, it appears that Plaintiff Sowders has been released from incarceration (DN 25).

Estes.  He sued Defendants Osborne, Basham and Estes in both their individual and official

capacities and sought monetary and punitive damages.

According to the verified complaint and its attachments, Plaintiff was denied the

opportunity to be seen by a physician from the time of his arrival at the DCDC for a probation

violation on May 10, 2004, at least through the date of filing of the complaint on July 28, 2004.[2]

During that 2½-month period, he filed medical request forms and grievances raising various

complaints and claiming that he was being denied medical treatment because he was a state

inmate.

**Vision**.  One of his medical requests was to see an eye doctor for replacement glasses

because he had poor vision and was experiencing headaches and dizzy spells.[3]  He reported that

his eye glasses were broken in a September 8, 2003, motor vehicle accident and claimed that the

eye glasses were a medical need because he could "hardly see" without them and because he was

indigent.  He reported that "they said the only way I would receive glasses or get to see the eye

doctor is if my insurance company or I pay for it first."

**Hepatitis-C**.  On June 6, 2004, Plaintiff filed a medical request for lab work to monitor

his liver condition.  He noted that the Phonex Health Center in Louisville said that his liver

enzymes were elevated causing his legs to swell.  He further noted that he had an appointment to

---

[2]In the prosecution of the case, Plaintiff did not file any supplements indicating that he was
denied treatment after the date of filing the complaint.

[3]In a medical request form dated June 6, 2004, Plaintiff asked to be seen by an eye doctor due to
headaches and dizziness.  Nurse Estes responded that she needed his medical records or name and phone
number of his eye doctor.  In a medical request form dated June 21, 2004, Plaintiff provided the name of
his eye doctor, Dr. Weinburg.  He also noted that he had an appointment with Dr. Weinburg on March 29,
2004, but he fails to explain why he did not get glasses at that time.  On July 12, 2004, Plaintiff filed an
appeal of all of his grievances and complained, "haven't been able to see a eye doctor, need glasses!"

see his regular physician, Dr. Karim, on May 6, 2004, but "couldn't make it." Nurse Basham responded, "Duplicate." On June 13, 2004, Plaintiff filed a grievance claiming that the nurse had yet to answer his request for lab work. Nurse Estes responded, "duplicate." In his July 12, 2004, appeal of all grievances, he reported, "Need lab work to check my liver condiction, legs are holding [fluid] and swelling!"

**Dental**. On June 9, 2004, Plaintiff filed a medical request form asking to see a dentist for a check up because his gums were bleeding and his "teeth . . . hurt." On the medical request form, he noted, "I am a State inmate who has rights to see a dentist if something is wrong." After receiving no response, he filed a grievance on June 13, 2004, advising that he has hepatitis-C and his "gums and teeth keep[] bleeding causing [him] to spit a lot [which] isn't healthy for other inmates to see." Nurse Estes responded, "[Plaintiff's] medical request regarding dental has been received." Thereafter, on June 27, 2004, Nurse Basham responded to Plaintiff's medical request for a dentist. She advised that he had been placed on the dental list but noted that there was a three- to six-month wait to see a dentist. On July 12, 2004, he filed an appeal of his grievances to Jailer Osborne and therein advised, "Need to see a Dentist infected gums!" In the complaint, Plaintiff asserted, "I am still in pain with my teeth hurting in the front and bleeding real bad and I still haven't been able to get any medical attention, this is really uncalled for and my condiction continues to get worse plus the pain is unbareable and infected."

**Blood pressure**. Another complaint reported by Plaintiff involved a change in his blood pressure medication. On June 30, 2004, he filed a medical request form asking why his two blood pressure medications were not being given at the same time as had been done for years. On July 2, 2004, Nurse Basham responded that the dispensing times had changed upon review

3

by the physician.  In the complaint, Plaintiff additionally complained that his blood pressure was running low, that he was dizzy, and that, on one occasion, his left arm felt "funny."[4]  He filed no medical requests as to those complaints, but on July 12, 2004, he appealed his grievances to Jailer Osborne, highlighting that on "July 11, 2004, Sands check my B/P it was 96/56 way to low for a guy who weights almost 300 pounds."

**Back and neck pain**.  Plaintiff primarily complained of being denied the opportunity to be seen by DCDC physician Dr. Byrd or Chiropractor Dr. Tinius for complaints of back and neck pain, a residual of injuries sustained in a motor vehicle accident on September 8, 2003.  On May 18, 2004, he filed his first medical request form asking to be seen by a doctor for his back pain, requesting a special pillow and an extra mat, and noting that he had been going to a chiropractor prior to his incarceration.  On May 19, 2004, he requested to been seen by Chiropractor Dr. Tinius for continued treatment for his back.  In response, Nurse Basham marked "Duplicate" on both request forms.  On May 24, 2004, he filed a grievance requesting to see Dr. Byrd and noted that his medical bills would be paid by his insurance company.  Nurse Basham responded that the inmate was "informed re: protocol."

On May 26, 2004, a guard took Plaintiff to the medical department, where he was seen by Defendant Nurse Basham.  Plaintiff asked to see DCDC physician Dr. Byrd and reported that he had been treated by Chiropractor Brian Tinius for realignment of his back prior to his entry in

---

[4]In the complaint, he noted that on July 6, 2004, he felt dizzy like he could pass out.  His blood pressure was 100/59.  He did not file a medical request but noted, "[I]t doesn't do any good to address this issue because I have done turned in numerous request to see a doctor."  He further reported that on July 14, 2004, he felt like he could pass out unless he sat down.  He said, "Dont really know what the problem is but its got something to do with my B/P because it has been running real low.  It has got to the point that it scares me at times and my left arm feels funny but it doest do any good to tell the medical staff here at the [DCDC] because they won't let you see a doctor."

the DCDC.  Plaintiff claims that in response,

> Tammy Basham told me that I wouldn't be seeing a doctor now because as long as I can walk down to medical, eat and sleep I would not see a doctor not even the Jail doctor.  I asked her why not she stated because my condiction is not life threating.  I asked her was she refusing me medical treatment because I am a State Inmate who has Rights to see a Medical Doctor when I need one.  She wouldn't answer me and stated your just going to have to live with the <u>Pain</u>!!

On May 28, 2004, Plaintiff filled out another medical request form asking to see the doctor "to show him paper work on my back that it is injured and that I am still in lots of pain." He also noted that his medical bills would be paid by the insurance company.  In response, Nurse Estes advised him to send the paperwork to the medical department but noted that "Sakari released you stating no further medical tx required."[5]  On June 13, 2004, Plaintiff requested to be seen by a doctor because of complaints of low back pain; pain between his shoulders; "stiffness or pain" in his neck; headaches; and difficulty sleeping.  Nurse Estes marked "duplicate" in response.

Plaintiff also claims that on June 13, 2004, he sent three grievances to Defendant Jailer Osborne "trying to let him know what was going on."  On June 16, 2004, however, the grievances were returned to him signed by Defendant Nurse Estes, who Plaintiff claims failed to show the grievances to Jailer Osborne.  Plaintiff reported that Nurse Estes noted that his medical requests had been received answered and advised that he "will be referred for disciplinary action for abuse of forms."

---

[5]Defendants point out that Plaintiff was previously incarcerated in the DCDC from September 2003 until March 2004 (DN 13).  Medical request forms filed during that time period reveal that Dr. Sakari was a physician to whom Plaintiff was referred for his complaints of back and neck pain. *Id.* at Ex. A.

On June 28, 2004, at 1:20 a.m., a guard asked Plaintiff if he wanted to see a nurse. Plaintiff answered in the affirmative and was taken to Nurse Basham.  He asked her whether he was going to be able to see the doctor.  Nurse Basham reviewed his medical request and said, <u>No!</u>"  Plaintiff then told Nurse Basham that "theres no need me seeing you."  Nurse Basham told him that he would have to sign the request "Refused."  Plaintiff initially refused to sign the request, but after Nurse Basham told the jailer[6] "to lock [Plaintiff] up in the hole for not signing," Plaintiff then signed the form.

Plaintiff reported that on July 8, 2004, his attorney sent him a letter from the insurance company informing him that benefits were available for him to continue seeing Dr. Tinius. Captain Ankrom had told Plaintiff that transportation would be provided if someone would pay his bills.

On July 12, 2004, Plaintiff filed an appeal of all of his grievances to Jailer Osborne.  He complained, "haven't been able to see a doctor about my back in two months!"  On July 13, 2004, Captain Ankrom responded that he "spoke with inmate and explained medical's position and told him to write his Doctor about his therapy."  Plaintiff reports that also on July 13, 2004, he met with Captain Ankrom and Jailer Osborne, who asked him what he wanted.  Plaintiff responded that he wanted medical treatment.  According to Plaintiff,

> They told me I cant get any eye glasses but they will see the nurse given me a pair of $1.00 reading glasses.  They still will not let me see a doctor unless I pay for it on any of my medical issues and I don't know what to do now because I need my lab work checked to see about my liver condiction.  Capt Ankrom stated Dr. Byrd said I don't need to be checked.

---

[6]In context, it appears that the "Jailer" referenced here is not Jailer Osborne but is actually the guard who escorted him to see Nurse Basham.

6

## II.  **DEFENDANTS' ARGUMENTS**

Defendants raise several arguments in their motion for summary judgment and memorandum in support (DN 13).[7]  As to the official capacity claims, Defendants argue that Plaintiff's Eighth Amendment rights have not been violated as he "received more than adequate treatment and an unbelievable amount of patience from the nursing staff considering the manner in which he abused the medical request procedure at the detention center."  They further argue that "there is nothing in the record . . . to establish that the County had a policy or custom to deprive plaintiff of his serious medical needs."

With respect to the individual capacity claims, Defendants claim that the only basis of liability asserted against Defendant Osborne is based on his position as Daviess County Jailer, and that, as such, Plaintiff has failed to demonstrate a basis for supervisory liability.  As to the individual capacity claims asserted against Nurses Basham and Estes, Defendants assume for the sake of argument that plaintiff suffered from a serious medical condition while at the DCDC, but they argue that Nurses Basham and Estes were not deliberately indifferent as detention center records, which have not been contradicted by Plaintiff, reveal that he "was clearly provided medical treatment for those medical conditions about which he complained."

As to Plaintiff's request to see an eye doctor for eyeglasses, Defendants contend that Plaintiff was advised to follow through on his automobile insurance with his attorney and they

---

[7]In support of their arguments, Defendants attached an affidavit of Nurse Estes, and several exhibits.  Exhibit A is a copy the Medical Request Forms filed by Plaintiff during his incarceration at the DCDC from September 2003 through March 4, 2004.  As Exhibit B, Defendants submitted a copy of Medical Request Forms filed by Plaintiff during his incarceration in the DCDC beginning May 10, 2004. Exhibit C is a copy of Nurse's Notes dated July 22, 2003, through December 29, 2004.  Exhibit D is a copy of DCDC transportation records showing each time Plaintiff was transported from the jail during both incarcerations.  And Exhibit E is a copy of Physician's Notes and Orders dated September 11, 2003, through January 3, 2005.

7

noted that he was out of jail from March 4, 2004, until May 10, 2004, during which time he could have seen an eye doctor and had his glasses replaced.

With respect to complaints of low blood pressure, Defendants report that Plaintiff continued to receive medication for that condition and that he had filed nothing to show that his blood pressure had not been controlled.  Physician's Notes and Transportation Records also reveal that on December 21, 2004, Plaintiff was transported out of the jail for an EKG and chest x-rays (Ex. D).

In regard to Plaintiff's request to see a dentist, Defendants advise that he was placed on the dental list, which had a waiting period of three to six months (Ex. B).  They report that pursuant to jail policy, all inmates are placed on a waiting list unless there is an emergency dental need, and inmates receive dental treatment in the order of severity of the complaints (Aff.).  Defendants argue, "Apparently, plaintiff had no serious dental need as there appears to be no follow up by either the plaintiff or the detention center after the initial request."

With regard to the Hepatitis-C claim, Defendants report that lab tests are performed every six months, earlier if necessary, although it is the inmate's responsibility to contact medical when the time period has elapsed (Aff.).  They also report that when Plaintiff's liver enzymes were elevated, they sent him to Dr. Hast, who would not treat him unless he was drug free for six months after incarceration (Aff.).

As to Plaintiff's request to see a doctor for his back and neck pain, Defendants report that Plaintiff was previously incarcerated in the DCDC from September 11, 2003 (only days after his motor vehicle accident on September 8, 2003), through March 4, 2004, during which time period he had x-rays and an MRI, both of which were normal (Aff.).  Plaintiff was initially examined by

DCDC physician Dr. Byrd and was later transferred to the care of Dr. Sakari, who prescribed anti-inflammatories and muscle relaxers (Aff.; Ex. A).  He was thereafter re-incarcerated in DCDC on May 10, 2004, for violating parole.

Upon re-entry into the DCDC, Plaintiff was examined by the nursing staff on May 26, 2004.  The nursing staff evaluated Plaintiff "using the standard protocol . . . to determine whether inmates actually need referral to physicians or whether their complaints are exaggerated." (Aff.).  Based on that protocol, no medical referral was deemed necessary (Aff.).  Since his May 10, 2004, incarceration at the DCDC, Plaintiff has been receiving the medication recommended by his examining physician (Aff.), and transportation records reveal that Plaintiff was transported to Dr. Tinius' office for chiropractic treatment on August 3, 2004, September 7, 2004, September 27, 2004, October 19, 2004, November 30, 2004, and January 4, 2005 (Ex. D).  Additionally, at the time the motion for summary judgment was filed, Plaintiff was working as a trustee at the detention center performing work that required lifting and mopping floors, and he had done so without complaint for at least the past nine months (Aff.).

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party's burden may be discharged by demonstrating that there is an absence of

evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof. *Id.* at 325.

Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his or her case with respect to which he or she bears the burden of proof. *Id*. at 322.  The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  "Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint or additional affidavit . . . satisfies the burden of the nonmovant to respond." *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001).  If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the nonmoving party fails to respond to the motion, there is no duty incumbent upon the trial court to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  A court's reliance on the facts advanced by the movant is proper and sufficient. *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 404 (6th Cir. 1992).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  The moving party, therefore, is "'entitled to a judgment as a matter of law' because

the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323-24.

## IV. <u>DISCUSSION</u>

To sustain an Eighth Amendment cause of action under § 1983 for failure to provide medical treatment, a plaintiff must demonstrate that the defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "An Eighth Amendment claim has two components, one objective and one subjective." *Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001).

To satisfy the objective component, "'the inmate [must] show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[T]he evidence need only show that 'the medical *need* at issue is sufficiently serious.'" *Blackmore*, 390 F.3d at 896 (emphasis added) (quoting *Farmer*, 511 U.S. at 834).

A medical need is sufficiently serious if "facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Blackmore*, 390 F.3d at 898. However, "[t]his 'obviousness' standard for determining a serious medical need is distinct from a separate branch of Eighth Amendment decisions where the seriousness of a prisoner's medical needs 'may *also* be decided by the *effect* of delay in treatment.'" *Blackmore*, 390 F.3d at 897 (first emphasis added) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994). Examples of the latter

branch include claims of "delayed administration of medication . . . or occasional missed doses of medication," *Blackmore*, 390 F.3d at 897; "claims based on a determination by medical personnel that medical treatment was unnecessary," *id.* at 898; and "decisions involving whether the prisoner was treated adequately[,] or whether any delay in providing medical care was harmless." *Id.* In such circumstances, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."[8] *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill*, 40 F.3d at 1188)).

To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Comstock*, 273 F.3d at 702-03. The indifference must be substantial; that is, it must be an offense to evolving standards of decency. *Estelle*, 429 U.S. at 106. The question of whether diagnostic techniques or other forms of treatment are indicated is a classic example of a matter for medical judgment. At most, a medical decision not to order an x-ray or like measures represents medical malpractice. *Id.* at 107. Furthermore, allegations of "inadvertent failure to provide adequate medical care" or of a negligent diagnosis fail to state a cause of action. *Id.* at 105-06. Simply stated, "medical malpractice does not become a constitutional violation merely

---

[8]"[W]here a plaintiff's claims arise from an injury or illness 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899-900 (citation omitted). "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 900.

because the victim is a prisoner." *Id.* at 106.  And a patient's disagreement with his physician over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable under § 1983.  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 816 n.13 (6th Cir. 1996); *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995).

Deliberate indifference, however, "'may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment.'" *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).  "Moreover, '[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'"  *Terrance*, 286 F.3d at 844 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

## A.  Individual Liability

**Vision**.  Plaintiff complained that Defendants failed to address his request to see an eye doctor in order to obtain replacement glasses.  Plaintiff broke his glasses months earlier in his September 2003 motor vehicle accident, and he even requested replacement glasses from the DCDC during his first incarceration, reporting poor vision, headaches, and dizziness as early as November 2003 (DN 13, Ex. A).  Despite these complaints, he failed to have his glasses replaced during the two-month period when he was released from March 4, 2004, until May 10, 2004.[9] The Court concludes that Plaintiff has failed to demonstrate a serious medical need for the eye

---

[9]Interestingly, in a June 21, 2004, medical request form, Plaintiff reports that he had an appointment with Dr. Weinburg, an eye doctor at Vision First, on March 29, 2004, while released from jail.  The Court is puzzled as to why Plaintiff did not have his glasses replaced at that time (DN 1).

glasses.  If the need was sufficiently serious, Plaintiff would have replaced his glasses during his period of release.  Consequently, Defendants are entitled to summary judgment on that issue.

**Hepatitis-C**.  In the complaint, Plaintiff claimed that his request for lab work to monitor his hepatitis-C condition went unheeded.  In his medical request form asking for lab work, however, Plaintiff reported that he had an appointment on May 6, 2004, while released from jail, to see his "regular doctor," Dr. Karim, but "couldn't make it." (DN 1, Attach.).  Plaintiff thus had an opportunity for treatment prior to his incarceration, and yet, without explanation, he failed to go.  Moreover, while Plaintiff may not have received immediate testing, the record reveals that lab work was eventually performed.  Nurse Estes averred that Plaintiff's labs were being followed (DN 13, Aff.); Physician's Notes reveal that Dr. Byrd ordered a liver profile on December 29, 2004 (DN 13, Ex. E); and Nurse Estes further averred that when Plaintiff's liver profile was elevated, he was sent to Dr. Hast who would not treat Plaintiff until he remained drug free for six months after incarceration (DN 13, Aff.).  Plaintiff has not contradicted this evidence.  Additionally, as his purported need for blood work would not have been obvious to a lay person, he must place verifying medical evidence into the record establishing the detrimental effect of the delay in the requested treatment.  This, he did not do.  As such, he has failed demonstrate a substantial risk of serious harm and has thus failed to meet the objective prong of an Eighth Amendment claim.

**Request to see a dentist**.  Defendants report that pursuant to jail policy, all inmates are placed on a waiting list in the order of severity, unless there is an emergency dental need which receives immediate attention (DN 13, Aff.).  While Nurse Estes advised that Plaintiff was placed on the dental list, which had a waiting period of three to six months, and she averred that "[n]othing further was heard from Mr. Sowders after the request of June 9, 2004." *Id.*

14

Although Plaintiff did not file a response to the motion for summary judgment, documents attached to the complaint, which Defendants have not contested, reveal that Plaintiff *did* complain of the need for dental treatment after filing his June 9, 2004, medical request.  To be sure, after receiving no response to his medical request, he filed a grievance on June 13, 2004, to which Nurse Estes herself responded, stating "medical request regarding dental has been received." (DN 1, Attach.).  Then, on July 12, 2004, Plaintiff filed an appeal of all of his grievances to Jailer Osborne and therein complained, "Need to see a Dentist infected gums!"  *Id.* Furthermore, in Plaintiff's verified complaint, *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001) ("[A] verified complaint . . . satisfies the burden of the nonmovant to respond."), he asserted, "I am still in pain with my teeth hurting in the front and bleeding real bad and I still haven't been able to get any medical attention, this is really uncalled for and my condiction continues to get worse plus the pain is unbareable and infected."

In light of the foregoing evidence, the Court concludes that Plaintiff has asserted facts and presented documentation from which a jury could reasonably conclude that Defendants wholly failed to treat his painful dental complaints and were thus deliberately indifferent to a serious medical need.  Defendants failed to provide the criteria they use for assessing the severity of an inmate's dental need, and they have failed to show why Plaintiff, with complaints of infected and bleeding gums and tooth pain, was told he had to wait at least three to six months for dental treatment.  Consequently, summary judgment will be denied as to Plaintiff's dental claim, and will continue against Defendants Estes, Basham, and Osborne.[10]

---

[10]The record demonstrates that both Nurse Basham and Nurse Estes had control over Plaintiff's treatment during the period in question and were aware of his dental complaints.  As to Jailer Osborne, Defendants contend that "[t]he only basis of liability asserted against [him] would be based on his position as jailer."  Having taken that position, Defendants argue that the doctrine of respondeat superior

**Blood pressure**.  Plaintiff claims that his medication dispense times were changed, that his blood pressure was running too low, and that he experienced dizziness and, on one occasion, left arm pain.  Despite these complaints, the Court concludes that the record could not lead the trier of fact to find that Defendants were deliberately indifferent to a serious medical need.  First, in his verified complaint, Plaintiff conceded that his blood pressure was being monitored on a regular basis and that he was receiving two types of blood pressure medication (DN 1).  Additionally, Nurse Estes averred that his medication was initially changed to try to avoid a rapid decrease in blood pressure, and she reported that his medication was changed again and had remained stable since that change (DN 13, Aff.).  While he complained of left arm pain in the complaint, there is no evidence that he ever reported this complaint to medical personnel.  "'[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'"  *Comstock v. McCrary*, 273 F.3d 693, 702-03 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

This is not a case where Plaintiff has altogether been denied medical treatment for his blood pressure complaints.  Courts often "distinguish between cases where the complaint alleges

does not apply to § 1983 actions and contend that there is no allegation of any active unconstitutional behavior on the part of Jailer Osborne to impose supervisory liability upon him.  In viewing the record in a light most favorable to Plaintiff, the Court disagrees.  Rather, Plaintiff filed a July 12, 2004, grievance directed to Jailer Osborne raising each of his complaints, including his dental complaint (DN 1, Attach.).  The following day, per the verified complaint, Plaintiff was taken to Captain Ankrom's office, where Jailer Osborne was located.  *Id.*  According to Plaintiff, "They asked me what do I wont and I told them some medical treatment on my issues. . . . They still will not let me see a doctor unless I pay for it on any of my medical issues."  *Id.*  Captain Ankrom then responded to the grievance on that same day, July 13, 2004, and wrote, "Spoke with inmate and explained medical's position and told him to write his Doctor about his therapy."  *Id.* at Attach.  In light of Jailer Osborne's personal meeting with Plaintiff about his medical issues as well as Jailer Osborne's determination that Plaintiff would have to pay for treatment with his own funds, the Court concludes that record contains sufficient evidence of direct involvement by Jailer Osborne in the denial of dental treatment for Plaintiff.

a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citations omitted).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* (citations omitted). As Plaintiff received regular blood pressure monitoring and prescription medication, his dispute is merely over the adequacy of treatment, and he has, at most, raised a state law negligence claim.  Such claim is insufficient to establish a federal constitutional violation under § 1983, entitling Defendants to summary judgment on this issue.

  **Back and neck pain**.  Finally, during the 2½-month period from his re-entry into DCDC until the filing of the complaint, Plaintiff requested to be examined by a physician or chiropractor for his complaints of back and neck pain.  Plaintiff's reported pain, however, was not a sudden onset upon his May 2004 incarceration.  Rather, the DCDC medical department treated Plaintiff's reports of pain during his first incarceration between September 2003 and March 2004, (DN 13, Aff. and Ex. 3), and during that time period, Plaintiff received treatment and medication from Dr. Byrd and from an outside physician, Dr. Sakari (DN 13, Exs. A and E). He also underwent x-rays and an MRI, which were reported as normal (DN 13, Aff.).  Following his re-entry into the DCDC in May 2004, Plaintiff was examined by the nursing staff, who knew of Plaintiff's medical history.  *Id.*  The nursing staff evaluated him using the standard protocol and determined that no medical referral was necessary.  *Id.*  Plaintiff was also receiving anti-inflammatories, *id.*, and he began receiving the chiropractic treatment he desired on August 3, 2004, continuing until January 4, 2005 (DN 13, Ex. D).

As with the blood pressure complaints, this is not a case where Plaintiff was altogether denied medical treatment for his complaints of back and neck pain.  He received some medical attention but disputed the adequacy of treatment received.  Defendants are thus entitled to summary judgment as to this Eighth Amendment claim.

### B. Municipal Liability

As the Daviess County Detention Center is not an entity subject to suit, *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994), the claims against the detention center must be brought against Daviess County as the real party in interest.  *Id.* (advising that since the county police department is not an entity which may be sued, the county is the proper party); *Smallwood v. Jefferson County Gov't*, 743 F. Supp. 502, 503 (W.D. Ky. 1990) (concluding that a suit against the fiscal court and judge executive is actually a suit against the county itself).  Similarly, because "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity," *Matthews*, 35 F.3d at 1049, the official capacity claims against Defendants Osborne, Estes, and Basham are actually against Daviess County.

When a § 1983 claim is made against a municipality, the Court must analyze two distinct issues:  (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).  As to the first issue, the Court has concluded that Plaintiff has sufficiently demonstrated that a trier of fact could conclude that his untreated dental complaints of bleeding and infected gums and tooth pain constituted cruel and unusual punishment under the Eighth Amendment.

As to the second issue, "a plaintiff seeking to hold a municipality liable under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of County*

18

*Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). "Locating a 'policy' ensures

that a municipality is held liable only for those deprivations resulting from the decisions of its

duly constituted legislative body or of those officials whose acts may fairly be said to be those of

the municipality." *Id.* at 403-04. "Similarly, an act performed pursuant to a 'custom' that has

not been formally approved by an appropriate decisionmaker may fairly subject a municipality to

liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*

at 404. "Beyond having to identify 'conduct properly attributable to the municipality itself,'"

*Cherrington v. Skeeter*, 344 F.3d 631, 645 (6th Cir. 2003) (quoting *Bd. of County Comm'rs of*

*Bryan County*, 520 U.S. at 404), a plaintiff "must also demonstrate that, through its deliberate

conduct, the municipality was the moving force behind the injury alleged." *Cherrington*, 344

F.3d at 645 (quoting *Bd. of County Comm'rs of Bryan County*, 520 U.S. at 404) (internal

quotation marks omitted).

Defendants contend that "nothing in the record . . . establish[es] that the *County* had a

policy or custom to deprive plaintiff of his serious medical needs." (DN 13) (emphasis added).

In the complaint and its attachments, however, Plaintiff repeatedly asserted that he was denied

medical treatment because he was a state inmate (DN 1). Seemingly then, he was claiming a

DCDC policy to deprive state inmates of medical treatment. Yet, Plaintiff has failed to provide,

at the summary judgment stage of litigation, any facts in support of this broad and conclusory

allegation. And the record demonstrates that he did receive treatment, though not of the specific

type or as immediate as he may have wanted, for his medical complaints. Because he has failed

to provide facts demonstrating a policy to deprive state inmates of medical treatment, Defendants

are entitled to summary judgment on that issue.

19

While the Court concludes that Plaintiff failed to demonstrate a DCDC policy of denying him medical treatment because of his status as a state inmate, Defendants themselves have identified a jail policy pertaining to the provision of dental treatment (DN 13). In particular, they report that pursuant to jail policy, inmates are placed on the waiting list in the order of severity with emergencies taking precedent. *Id.* at Aff. The Court does not know whether the jail policy defines an "emergency" or whether it provides criteria that the nursing staff is to use in determining in which order to place an inmate on the list. All the Court knows is that based on this policy, the nurses determined that Plaintiff's dental condition was not emergent and caused him to be placed on a dental list and wait for an indefinite period of time to receive treatment for unbearable pain and infected and bleeding gums.

As to whether the *jail* policy is a *county* policy, Defendants have failed to establish who (the jailer, the fiscal court, or some other individual or entity) has the final decisionmaking authority over dental policy decisions. In *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Supreme Court held that when a particular course of action is directed by those who establish governmental policy, the municipality is equally responsible. 475 U.S. at 481. The Court indicated that municipal liability "attaches where 'and only where' a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 470. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the Supreme Court also held that in order for municipal liability to attach, an official's decisionmaking authority could not be constrained by a superior's policy decisions.

20

The Court explained that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* at 127; *Johnson v. Hardin County, Ky.*, 908 F.2d 1280, 1286-1287 (6th Cir. 1990) (county could not be liable absent evidence that jailer was vested with final authority to make all of the county's medical policy decisions). After identification of those officials who possess the power to make policy on a particular issue, "it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, . . . or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), 491 U.S. 701, 737 (1989).

Defendants have failed to address the issue of whether Jailer Osborne, or some other person or entity, has the final authority (whether by legislative enactment, by delegation without constraint, or by custom) to promulgate Daviess County policy regarding the provision of dental care to inmates. Therefore, Defendants, as the parties moving for summary judgment, have not met their burden of demonstrating the absence of a genuine issue of material fact. Consequently, summary judgment with respect to the denial of dental treatment claim against Daviess County will be denied.

21

## V.  <u>ORDER</u>

For the reasons set forth more fully above, there are no genuine issues of material fact as to Plaintiff's Eighth Amendment claims that he was denied lab work for his hepatitis-C condition, denied replacement eye glasses, and denied medical attention for his complaints of back and neck pain and blood pressure problems.  Defendants are thus entitled to summary judgment as a matter of law on those issues.  Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment on those claims is **GRANTED**.

As to the Eighth Amendment claim that Plaintiff was denied dental treatment while at the DCDC, the Court concludes that there are genuine issues of material fact warranting denial of summary judgment on that issue.  **IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment with respect to the denial of dental treatment claim is **DENIED**.  That claim will continue against Defendants Osborne, Estes, and Basham, individually, and against Daviess County.  By separate Order, the Court will refer that matter to the magistrate judge for a settlement conference.

Date:

cc:      Plaintiff, *pro se*
         Counsel of Record
4414.005